IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CASE NO. 3:25-CV-804

United States of America

v.

All funds seized from Wells Fargo Account
XXXXXX3167, an Initiate Business
Checking Account held in the name of Cedric
Dean Holdings, Inc.;

All funds seized from Wells Fargo Account
XXXXXX3183, an Initiate Business
Checking Account held in the name of Cedric
Dean Holdings, Inc.;

One 2019 Chevrolet Silverado 2500 Truck,
VIN 1GC1CREGXKF254269;

One 2018 Thor Ace 32.1 Motorhome,
VIN 1F66F5DY2J0A13942;

One 2013 Georgetown Motorhome,
VIN 1F66F5DYXC0A06353;

One 2021 Ram 1500 Big Horn Crew Cab
Truck, VIN 1C6SRFFT9MN792975;

Real property at 1712 S. Lafayette Street in
Shelby, North Carolina, more particularly
described in a Deed at Book 1863, Pages 927-
934 in the Office of Register of Deeds for
Cleveland County, North Carolina;

Real property at 5502 McChesney Drive in
Charlotte, North Carolina, more particularly
described in a Deed at Book 35254, Pages
985-986 in the Office of Register of Deeds for
Mecklenburg County, North Carolina;

Real property at 318 Gold Street in Shelby,
North Carolina, more particularly described in

**AMENDED COMPLAINT
FOR FORFEITURE *IN REM***

a Deed at Book 1938, Pages 965-966 in the Office of Register of Deed for Cleveland County, North Carolina; and

Real property at 15906 Youngblood Road in Charlotte, North Carolina, more particularly described in a Deed at Book 39590, Pages 214-216 in the Office of Register of Deeds for Mecklenburg County, North Carolina.

NOW COMES the United States of America, Plaintiff herein, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

## **INTRODUCTION**[1]

1. This is a civil action *in rem* brought by the United States against all present and future interest in the above captioned properties (hereafter, "DEFENDANT PROPERTIES").

2. This action seeks the forfeiture of all right, title, and interest in the DEFENDANT PROPERTIES because they constitute or are derived from proceeds of conspiracy and health care fraud in violation of 18 U.S.C. §§ 1347 and 1349; and/or property involved in money laundering conspiracy in violation of 18 U.S.C. § 1956(h), promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and illegal monetary transactions in violation of 18 U.S.C. § 1957.

3. In summary, from in or around September 2024 and continuing through the present, in Mecklenburg County, in the Western District of North Carolina and elsewhere, Cedric DEAN, through his company Cedric Dean Holdings, Inc. ("CDH"), and others employed by or associated with CDH (collectively, "the conspirators"), executed a health care fraud scheme through which

---

[1] The Government amends the original Complaint to omit and explain items that law enforcement ultimately did not seize and add an item that law enforcement did seize, and to provide limited additional sections on the financial analysis and results of the investigation to-date.

the conspirators: (a) acquired Medicaid beneficiary identification numbers from beneficiaries at homeless shelters, homeless encampments, and halfway houses in North Carolina; (b) paid individuals to recruit such Medicaid beneficiaries; (c) provided free or discounted temporary housing, a meal, a payment, or other *de minimis* benefits to Medicaid beneficiaries in return for their Medicaid identification numbers; (d) caused the submission of claims to Medicaid for Mobile Crisis Management, Peer Support Services, Supported Living, or Behavioral Health Urgent Care services purportedly rendered by CDH or associated individuals; and (e) did not render the services for which CDH and associated individuals caused the submission of claims to Medicaid. Indeed, the conspirators billed exorbitant amounts for services that the conspirators could not, within the bounds of space and time, provide; and conducted billing that was 894% more than the provider that submitted the second highest number of similar claims, according to a peer comparison study. All the while, the conspirators denied services to homeless individuals who could not provide Medicaid information useful to the conspirators for purposes of billing.

4.     As a result of these offenses, in violation of 18 U.S.C. §§ 1347 and 1349, the conspirators obtained millions of dollars in fraud proceeds, which they then funneled through numerous accounts, and used to purchase and fund the DEFENDANT PROPERTIES and further promote the scheme, in violation of 18 U.S.C. §§ 1956 and 1957. For example, in some instances, the conspirators used one or more of the DEFENDANT PROPERTIES, in the form of houses and recreational vehicles, to induce more at-risk individuals to provide Medicaid identifiers that the conspirators could use to further the scheme. In other instances, the conspirators used the DEFENDANT PROPERTIES to pay salaries and wages to participants in the scheme. Thus, the DEFENDANT PROPERTIES are subject to forfeiture as fraud and fraud conspiracy proceeds and

as property involved in money laundering conspiracy, substantive money laundering offenses, and illegal monetary transactions.

## JURISDICTION AND VENUE

5.     Procedures for this action are mandated by Rule G of the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981, 983, 984, and 985, and the Federal Rules of Civil Procedure.

6.     This Court has jurisdiction over this action commenced by the United States under 28 U.S.C § 1345 and over this action for forfeiture under 28 U.S.C. § 1355(a). The Court has *in rem* jurisdiction over the DEFENDANT PROPERTIES under 28 U.S.C § 1355(b).

7.     This Court has venue pursuant to 28 U.S.C §§ 1355 and 1395. Venue is proper because the DEFENDANT PROPERTIES are found in this district and because acts or omissions giving rise to forfeiture occurred in this district.

8.     The DEFENDANT PROPERTIES, discussed in more detail below, are as follows:

- All funds seized from Wells Fargo Account XXXXXX3167, an Initiate Business Checking Account held in the name of Cedric Dean Holdings, Inc. ("WELLS FARGO ACCOUNT 3167");

- All funds seized from Wells Fargo Account XXXXXX3183, an Initiate Business Checking Account held in the name of Cedric Dean Holdings, Inc. ("WELLS FARGO ACCOUNT 3183");

- One 2019 Chevrolet Silverado 2500 Truck, VIN1GC1CREGXKF254269 ("SILVERADO");

- One 2018 Thor Ace 32.1 Motorhome, VIN1F66F5DY2J0A13942 ("THOR MOTORHOME");

- One 2013 Georgetown Motorhome, VIN1F66F5DYXC0A06353 ("GEORGETOWN MOTORHOME");

- One 2021 Ram 1500 Big Horn Crew Cab Truck, VIN 1C6SRFFT9MN792975 ("RAM BIG HORN");

4

- Real property at 1712 S. Lafayette Street in Shelby, North Carolina, more particularly described in a Deed at Book 1863, Pages 927-934 in the Office of Register of Deeds for Cleveland County, North Carolina ("LAFAYETTE STREET PROPERTY");

- Real property at 5502 McChesney Drive in Charlotte, North Carolina, more particularly described in a Deed at Book 35254, Pages 985-986 in the Office of Register of Deeds for Mecklenburg County, North Carolina ("MCCHESNEY DRIVE PROPERTY");

- Real property at 318 Gold Street in Shelby, North Carolina, more particularly described in a Deed at Book 1938, Pages 965-966 in the Office of Register of Deed for Cleveland County, North Carolina ("GOLD STREET PROPERTY"); and

- Real property at 15906 Youngblood Road in Charlotte, North Carolina, more particularly described in a Deed at Book 39590, Pages 214-216 in the Office of Register of Deeds for Mecklenburg County, North Carolina ("YOUNGBLOOD ROAD PROPERTY").

## THE MEDICAID PROGRAM

### INTRODUCTION

9. The Medicaid program is a federal health care benefits program that helps pay for reasonable and medically necessary services for enrolled individuals, referred to herein as "beneficiaries." The Medicaid program is administered by state governments. In North Carolina, the Medicaid program is administered by the North Carolina Department of Health and Human Services Division of Health Benefits ("DHB"). The Medicaid program and DHB are collectively referred to herein as "NC Medicaid." NC Medicaid is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

10. If an individual meets the income and other requirements set by the state, an individual can enroll as a Medicaid beneficiary. At the time of enrollment, a beneficiary receives a unique alphanumeric code that is issued by the program. This code is known as a Medicaid

Identification Number. Similar to private insurance, beneficiaries may use their Medicaid Identification Numbers to receive covered medical services.

11. Any physician, hospital, clinic, or other healthcare professional or facility that enrolls with Medicaid and provides services to Medicaid beneficiaries is referred to as a Medicaid "provider." Providers must obtain a federal identification number, known as a National Provider Identifier ("NPI"). To participate in the Medicaid program, all Medicaid providers must certify that they will only cause the submission of claims to Medicaid for services they actually render.

12. For mental health services covered by NC Medicaid, providers submit claims for payment of their services either by direct bill to NC Medicaid through NC Tracks, which is a portal through which providers can submit Medicaid claims, or through entities called managed care organizations ("MCOs"). MCOs contract with the state to deliver Medicaid benefits based on a capitated rate.

13. Providers generally employ or contract with licensed professionals who are qualified to perform the specific service types offered by the provider to Medicaid beneficiaries. Licensed professionals are also issued an NPI number that may be used in conjunction with a provider's NPI when submitting claims to Medicaid and MCOs. In billing records, the NPI assigned to the professional providing the service may be referred to as the rendering provider. These licensed professionals, if using an NPI number to submit claims to the Medicaid program, or if contracted with Medicaid to be a provider, must also certify that they will only cause the submission of claims for services they actually render.

14. After a provider, through one of its licensed professionals, renders a covered medical service to a beneficiary, the provider submits a claim to Medicaid and identifies the rendered medical service by using the Current Procedural Terminology code ("CPT code") issued

by the American Medical Association or the Health Care Procedure Coding System ("HCPCS") code issued by the Center for Medicaid and Medicare Services ("CMS"). The provider is reimbursed based on the set state rate for that code or service. For a provider to obtain reimbursement, the provider must submit information relating to the service, such as the provider name, provider address, provider number, rendering provider name, rendering provider number, patient name, Medicaid Identification Number, the date of service, the nature of the service rendered, and the date of billing. The provider must also select the most specific billing code that accurately and completely describes the procedure, product, or service provided. The provider then submits an electronic claim to Medicaid, either directly or through an MCO. Providers may also hire billing companies or contractors to manage billing and claim submissions.

15.     Generally, services are reimbursed without NC Medicaid or the MCOs reviewing supporting documentation or confirming the services with the beneficiary or provider. NC Medicaid and the MCOs presume the truth of each claim submitted and reimburse providers for the services claimed. The provider is entrusted with ensuring that NC Medicaid only receives claims for services rendered.

16.     NC Medicaid and its MCOs retain the right to audit provider records after payment has been made. As such, providers are required to maintain service notes and other medical records for a minimum of five full years from the date of service. These records document and substantiate any reimbursement, and providers must produce these records if requested by NC Medicaid or the MCOs. In the event that the provider's claims are not supported by the documentation, NC Medicaid or the MCOs may recoup those funds from the provider or impose other sanctions. Under no circumstances is a provider permitted to fabricate records to support claims for services in response to an audit or other governmental inquiry.

**NC MEDICAID MENTAL HEALTH AND SUBSTANCE ABUSE POLICY**

17.     As with physical health services, NC Medicaid reimburses providers for the provision of mental health services to NC Medicaid beneficiaries.  Medicaid rules require that a mental health care recipient have a current diagnosis reflecting the need for treatment in order to receive covered mental health services.  All covered services must be medically necessary for meeting specific preventive, diagnostic, therapeutic, or rehabilitative needs of the recipient.  The needs are evidenced by the presence of a diagnosable mental, behavioral, or emotional disturbance with documentation of symptoms and effects reflected in a Person-Centered Plan ("PCP") and a Comprehensive Clinical Assessment ("CCA").[2]  The CCA reflects the presenting problems, symptoms, personal history, medical history, diagnosis, and recommended services for treatment. To be eligible for reimbursement, NC Medicaid requires that a written PCP for the delivery of medically necessary services be in place before any services can be billed to NC Medicaid.

18.     A signed service order is then completed and signed by the recipient, parent, or guardian, and must be signed by a Medical Doctor ("MD"), Doctor of Osteopathic Medicine ("DO"), Licensed Psychologist, Nurse Practitioner ("NP"), or Physician Assistant ("PA").  A service order is necessary for all enhanced services such as Behavioral Health Urgent Care ("BHUC"), Substance Abuse Intensive Outpatient Program ("SAIOP"), or Substance Abuse Comprehensive Outpatient Treatment ("SACOT").  The service order demonstrates medical necessity for a service and is based on an assessment of each recipient's individual needs.

---

[2] Information derived from NC Medicaid Clinical Coverage Policy No. 8A, Enhanced Mental Health and Substance Abuse Services.  https://medicaid.ncdhhs.gov/8a-enhanced-mental-health-and-substance-abuse-services/download?attachment.

19.     NC Medicaid shall not cover procedures, products, and services when the recipient does not meet the eligibility requirements or the medical necessity criteria, or the procedure, product, or service unnecessarily duplicates another provider's procedure, product, or service.

## MOBILE CRISIS MANAGEMENT[3]

20.     Mobile Crisis Management ("MCM") is a type of mental health treatment covered by Medicaid which provides an immediate evaluation, triage, and access to certain services, if certain criteria are met. MCM uses the CPT code of H2011 and is billed in 15-minute increments. The beneficiary is eligible to continue MCM if the crisis has not been immediately resolved or stabilized or a clinically appropriate referral or placement has not been determined.

21.     MCM involves all support, services, and treatments necessary to provide integrated crisis response, crisis stabilization interventions, and crisis prevention activities. MCM services are available at all times, 24-hours-a-day, 7-days-a-week, 365-days-a-year. Crisis response provides an immediate evaluation, triage, and access to acute mental health, intellectual/developmental disabilities, or substance abuse services, treatment, and supports to effect symptom reduction, harm reduction, or to safely transition persons in acute crises to appropriate crisis stabilization and detoxification supports or services. These services include immediate telephonic or telehealth response to assess the crisis and determine the risk, mental status, medical stability, and appropriate response. MCM also includes crisis prevention and supports that are designed to reduce the incidence of recurring crises. These supports and services must be specified in a beneficiary's Crisis Plan, which is a component of all PCPs.

---

[3] Information derived from NC Medicaid Clinical Coverage Policy No. 8A, Enhanced Mental Health and Substance Abuse Services. https://medicaid.ncdhhs.gov/8a-enhanced-mental-health-and-substance-abuse-services/download?attachment.

### Service Type and Setting

22.     MCM is a "second level" service, in that other services must be billed before crisis management, as appropriate.  For example, if the beneficiary's outpatient clinician stabilized his or her crisis, the outpatient billing code shall be used, not crisis management.  If a community support team worker responds and stabilizes the crisis, the community support team billing code shall be used.

### Program Requirements

23.     For beneficiaries new to the public system, MCM must develop a Crisis Plan before discharge.  This Crisis Plan shall be provided to the beneficiary, caregivers (if appropriate), and any agencies that may provide ongoing treatment and supports after the crisis has been stabilized. For beneficiaries who are already receiving services, MCM providers must recommend revisions to existing crisis plan components in PCPs, as appropriate.

### Eligibility Criteria

24.     The beneficiary is eligible for MCM services when the following criteria are met:

    a.  The beneficiary or family are experiencing an acute, immediate crisis as determined by a crisis rating scale specified by the Division of Mental Health;

        AND

    b.  The beneficiary or family has insufficient or severely limited resources or skills necessary to cope with the immediate crisis;

        OR

    c.  The beneficiary or family members evidence impairment of judgment, impulse control, cognitive or perceptual disabilities;

        OR

    d.  The beneficiary is intoxicated or in withdrawal, in need of substance use disorder treatment and unable to access services without immediate assistance.

## BEHAVIORAL HEALTH URGENT CARE[4]

25.     BHUC was first included in the state funded care of mental health, developmental disabilities, and substance abuse services in February 2020 to provide an alternative and diversion from the use of hospital emergency departments for individuals experiencing a behavioral health issue.  BHUC is billed under CPT code T2016 and is billed as one unit per one event.

26.     At a minimum, the BHUC setting must be able to provide involuntary commitment first evaluations, crisis/risk assessment, physical health screening/medical screenings, psychiatric services, clinical evaluation, referrals and case management and disposition and discharge planning.  The service covers triage, crisis assessment, interventions, disposition and discharge planning.

27.     Triage is to be initiated within fifteen minutes of a beneficiary's arrival and consists of an intensity of needs screening, which determines a behavioral health urgency status, which could be routine, urgent, or emergent and may include the need for emergency medical attention. Only beneficiaries meeting the criteria for urgent or emergent are eligible for this BHUC service.

28.     Within two hours of arrival at the BHUC setting, a crisis/risk assessment should be initiated and a licensed clinical professional is required to observe and interview the individual, establish a diagnosis, and compile an evaluation that informs the services provided.

29.     Interventions refer to the strategies and actions that are implemented to help de-escalation, assessment, therapeutic interventions, and supports.  Following the interventions, disposition and discharge planning can vary depending on the beneficiaries' needs.

30.     For services provided under this code, the BHUC services must be provided by practitioners employed by a mental health or substance use provider organization that meets the

---

[4] Information derived from NCDHHS: State Funded Behavioral Health Urgent Care policy.
https://www.ncdhhs.gov/documents/files/state-funded-behavioral-health-urgent-care-bhuc/open

requirements of the North Carolina Administrative Code. Staffing requirements under the policy necessitate, at a minimum, that a licensed clinician be onsite during all operational hours or a minimum of sixteen hours per day depending on the BHUC tier (*e.g.*, Tier III and Tier IV). A Tier III BHUC is operational at least twelve hours a day (with a minimum of 6 operational hours occurring after 4:00 pm each day), seven days a week, three hundred and sixty-five days a year. A Tier IV BHUC is operational twenty-four hours a day, seven days a week, three hundred and sixty-five days a year. In addition to these requirements, qualified nursing staff must be onsite during operational hours, a qualified professional must be on-site at all times, a Licensed Clinical Addiction Specialist or a Certified Substance Abuse Specialist must be on staff for the BHUC and a psychiatrist, and a physician's assistant who is supervised by a psychiatrist or Nurse Practitioner must be available in person or via Tele-Health, when allowed, for consultation when the BHUC is operating.

31.     Documentation of services provided is required under this policy. The minimum standard is a service note for each contact, service event, or intervention that includes the required elements outlined in the standard Records Management and Documentation Manual.

32.     The policy also outlines BHUC exclusions and specifically states that BHUC is not to replace MCM or be used as a diversion from MCM. BHUC is also not to be billed at the same time as other similar services.

### SUPPORTED LIVING[5]

33.     Providers may bill Medicaid under CPT Code T2033 for certain types of residential care. This service provides non-medical residential care for individuals who need support with daily activities but do not require intensive medical care. This type of care is intended for

---

[5] Information derived from NC Medicaid Clinical Coverage Policy No. 8-P, North Carolina Innovations. https://medicaid.ncdhhs.gov/8p/open.

individuals who are unable to live independently due to physical or cognitive impairments and who need a safe, supportive environment that enables residents to live as independently as possible while receiving the help they need with daily activities. Care is provided on a per diem basis, with services tailored each day to meet the individual needs of the beneficiary. This type of care is intended for beneficiaries with chronic conditions, such as dementia or mobility impairments, individuals needing short-term assistance while recovering from surgery or illness, or those who cannot safely live alone due to significant impairments in daily living skills. This type of residential care provides daily assistance with activities such as bathing, dressing, meal preparation, medication management, and supervision. This form of care can range from short-term (a few weeks) to long-term (several years), depending on an individual's needs.

**PEER SUPPORT SERVICES[6]**

34. Peer Support Services ("PSS") are an evidenced-based mental health model of care that provides community-based recovery services directly to a Medicaid-eligible adult beneficiary diagnosed with a mental health or substance abuse disorder, if certain criteria are met. PSS uses the CPT code of H0038. NC Medicaid will not cover certain activities of PSS, such as transportation for the beneficiary or family members or habilitation activities. A beneficiary can receive PSS from one provider organization during an episode of care. PSS provides structured, scheduled services that promote recovery, self-determination, self-advocacy, engagement in self-care and wellness, and enhancement of community living skills of beneficiaries. PSS services are directly provided by Certified Peer Support Specialists ("CPSS") who have self-identified as a person(s) in recovery from a mental health or substance use disorder. PSS can be provided in combination with other approved mental health or substance use services or as an independent

---

[6] Information derived from NC Medicaid Clinical Coverage Policy No. 8G, Peer Support Services. https://medicaid.ncdhhs.gov/8g-peer-support-services/download?attachment.

service. Due to the high prevalence of beneficiaries with co-occurring disorders (mental health, substance use, or physical health disorders), it is a priority that integrated treatment be available to these beneficiaries.

### Specific criteria covered by Medicaid

35.     Medicaid shall cover PSS when all of following criteria are met:

    a.     The beneficiary has a mental health or substance use diagnosis as defined by the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-5) or any subsequent editions of the Medicaid reference material, other than a sole diagnosis of intellectual and developmental disability;

    b.     The beneficiary with a substance use diagnosis meets the American Society of Addiction Medicine (ASAM) Level 1 criteria;

    c.     There is no evidence to support that alternative interventions would be equally or more effective based on North Carolina community practice standards; and

    d.     The beneficiary has documented identified needs, in at least ONE or more of the following areas (related to diagnosis):

        i.     Acquisition of skills needed to manage symptoms and utilize community resources;

        ii.     Assistance needed to develop self-advocacy skills to achieve decreased dependency on the mental health system;

        iii.     Assistance and support needed to prepare for a successful work experience;

        iv.     Peer modeling needed to take increased responsibilities for his or her own recovery; or

        v.     Peer supports needed to develop or maintain daily living skills.

36.     The PSS program must be under the direction of a full-time Qualified Professional ("QP") who meets the requirements according to 10A NCAC 27G .0104 (21). The PSS program must have designated competent mental health or substance use professionals to provide supervision to CPSS during the times of service provision. The maximum program staff ratios are as follows: QP-to-CPSS is 1:8; CPSS-to-beneficiary is 1:15; and group ratio for CPSS Group Facilitator-to-beneficiaries is 1:12.

## THE SCHEME

## ENTITIES AND INDIVIDUALS

37.    Cedric DEAN is a resident of the YOUNGBLOOD ROAD PROPERTY.  DEAN is Chief Executive Officer (CEO) of Cedric Dean Holdings, Inc.  DEAN has a Medicaid NPI under his name.  The number is XXXXXX7013.  DEAN is a Certified Peer Support Specialist.

38.    Cedric Dean Holdings, Inc., or CDH, is an active corporation registered in North Carolina.  According to North Carolina Secretary of State Records ("NCSOS"), DEAN is the CEO of CDH.  According to NCSOS records, the principal office of CDH is the MCCHESNEY DRIVE PROPERTY.

39.    According to U.S. Centers for Medicare & Medicaid Services, DEAN is the authorized official, a Behavioral Health Practitioner, for CDH.  CDH NPIs are XXXXXX3086 and XXXXXX1227.  CDH also does business as Peer Support NC.  According to U.S. Centers for Medicare and Medicaid Services records, the real property at 2001 Catherine Simmons Avenue, Charlotte, North Carolina (the "Catherine Simmons Avenue Location") is listed as the primary address for CDH.

40.    Dean operated CDH from his personal residences, including first the MCCHESNEY DRIVE PROPERTY, where he lived until approximately June 2025, and then also the YOUNGBLOOD ROAD PROPERTY.  Further, Dean also used the Catherine Simmons Avenue Location for Medicaid-reimbursed services purportedly rendered by CDH.

## CDH MEDICAID CLAIMS

41.    According to Medicaid billing claims data, CDH has billed the Medicaid program at least approximately $14,501,878.83 as of the date of filing of this Complaint, and CDH was reimbursed a total of $8,947,424.24 from Medicaid between September 2024 and June 2025.  Of

15

the amount reimbursed to CDH by Medicaid, $6,333,425 of that total was billed under CPT code H2011 (MCM); $1,495,968 was billed under CPT code T2016 (BHUC); $1,037,791.80 was billed under CPT code T2033 (Supported Living); and $77,572.02 was billed under CPT code H0038 (Peer Support).

42.    CDH's claims were submitted to Medicaid through six different MCOs.

**CLAIMS DATA ANALYSIS**

43.    An analysis was conducted of CDH's Medicaid claims submission practices. According to the Medicaid claims submission data, CDH submitted claims for services not rendered for PSS, MCM, and Supported Living.  For example, an analysis of billing claims data revealed that CDH submitted 54 claims for Supported Living Services to Medicaid after Beneficiary 1's death.  Specifically, Beneficiary 1 died on January 6, 2025.  Yet, CDH submitted claims for living services for every day from January 7, 2025 until February 28, 2025, totaling $11,124 billed.  An MCO also interviewed multiple beneficiaries on whose behalf CDH billed Medicaid for rendering PSS, MCM, or Supported Living Services, and they informed the MCO that they did not receive such services from CDH.

44.    Further, the claims data reflects that a single CDH staff member, identified as the clinical director of CDH, billed 8 hours of MCM services each for 24 different beneficiaries on the same date of service, March 31, 2025.  This supports the finding that services billed were not rendered, as the MCM service definition does not allow group MCM treatment.  In response to a request for information regarding the services that occurred on March 31, 2025, DEAN provided documentation that the CDH staff member rendered MCM services during a 12-hour shift to all 24 beneficiaries at a housing shelter.  The notes for all 24 beneficiaries generally reflected the same narrative: the beneficiaries were homeless individuals experiencing symptoms-related natural

stressors and/or substance abuse, and CDH provided the beneficiaries with a meal, shelter, and purported "community resources" through CDH. All 24 beneficiaries received the same diagnosis of "F79 – unspecified intellectual disability," there was no formal assessment as required by the service definition, and there was no variation on the amount of MCM units on the claims. All beneficiaries received 32 units of care. CDH's claims submissions therefore reflect impossible and improbable days. Notably, there was no variation between diagnosis codes and the units for services did not fluctuate. There was also no variation of service delivery based on clinical needs. It was determined that the shelter did not engage CDH to provide services at the shelter, and shelter representatives had no record or knowledge of CDH operating at the shelter at any date or time. Thus, CDH employees went to a third-party homeless shelter, acquired Medicaid beneficiary information for 24 individuals who were present, and then billed them all for the same purported 8-hour treatment, inconsistent with MCM regulations.

45.     The claims data reflects that CDH engaged in exclusionary billing while beneficiaries were engaged in other enhanced services and during inpatient hospitalization. Twelve beneficiaries had outpatient billing with CDH that overlapped with an inpatient stay. If those patients were receiving inpatient treatment, CDH could not have provided the billed outpatient medical services.

46.     In regard to improper recruitment, inducement, and kickbacks for beneficiaries, at least one CDH employee stated that CDH identifies its Medicaid beneficiaries via recruiters who take CDH recreational vehicles "out into the community" and "talk to people who have insurance."

47.     An analysis of CDH claims submission documentation found that CDH failed to comply with documentation requirements. The analysis found: (1) service notes with missing elements, such as missing type of contact or place of service; (2) beneficiary records with

incomplete intake packet documentation; and (3) evidence of canned documentation in the service notes and CCPs.

48.     To assess and/or identify potential fraudulent claims, a comparison amongst companies providing similar services can demonstrate outlier companies whose billing is excessive in comparison to other companies who provide the same services.  A peer company comparison analysis was conducted, comparing fifteen providers billing for MCM with one MCO.  CDH had the highest "adjudicated" units among the fifteen providers.  In fact, CDH billed 894% more than the provider that billed the second highest number of adjudicated units of MCM claims.  CDH's adjudicated total for MCM services was approximately $5,284,719, whereas the second highest MCM provider only billed an adjudicated total of $556,083.  Additionally, the analysis found that CDH billed the third highest average of adjudicated units per beneficiary (96 units)[7] in comparison to the fifteen peer MCM providers.  CDH submitted claims for 559 beneficiaries, the second highest number of beneficiaries served by a MCM provider.  In contrast, another provider billed the highest number of beneficiaries (933), but that provider only averaged 6.4 adjudicated units per beneficiary, as opposed to CDH's 96 units per beneficiary.  Based on this data analysis, as well as the lack of sufficient CDH staff to even bill these extraordinarily inflated amounts, CDH was billing for services not provided to beneficiaries.

49.     Based on an analysis by an MCO, CDH did not use an evidence-based crisis scale to triage and rate the crisis threshold.  There was no evidence that CDH had established a way to triage MCM requests, such as by conducting an intensity of needs screening.  Further, CDH did not maintain a rating scale to assess lethality for members experiencing suicidal or homicidal thoughts, including assessment of intention, means, and access.

---

[7] Since MCM is billed in 15-minute units, this means the 96 units per beneficiary billed by CDH is equal to 24 hours of service.

50. An MCO found that there was no evidence that CDH clinicians staffed MCM calls prior to disposition or that they fulfilled any role other than signing the service notes. DEAN has stated that he requires a minimum of 8 hours of response during a crisis episode. This approach to billing and response reflects not only CDH's failure to individualize its response for beneficiaries; but that CDH maintained a global requirement that appeared designed to increase profitability. Specifically, the average of adjudicated units per claim line equaled 31 units per claim (7.75 hours).

51. In addition, DEAN's NPI was attached to 96% (2,405) of all PSS claims during the timeframe of the review, reaching an adjudicated total of $52,570.88. Because his NPI was used to submit these claims, this meant DEAN would have provided 96% of all PSS services himself. The data reflects upwards of 65 members per day served by Dean, with an average of 15 members per day.

## INFORMATION FROM WITNESSES

52. Law enforcement has interviewed no less than eight witnesses who worked for CDH and/or lived in facilities operated in conjunction with CDH, and/or on whose behalf CDH submitted Medicaid claims. Those witnesses advised as follows:

    a. CDH, DEAN, and CDH's recruiters found people on the street, obtained their personal information and Medicaid information, and submitted claims to Medicaid for services that the people did not receive. These individuals often included those congregating at homeless encampments. Medicaid claims submission data confirmed that CDH did, in fact, submit Medicaid claims and receive Medicaid payments for those beneficiaries.

    b. CDH, DEAN and the recruiters paid people in return for their Medicaid beneficiary information. DEAN and CDH paid these people via the provision of food and temporary housing. However, a homeless person could only receive a meal or temporary housing from CDH/DEAN if the person had and provided information on a certain type of Medicaid for CDH to bill.

    c. DEAN maintained a staff, but not enough to provide services commensurate with CDH's Medicaid claims submissions. Some of these staff resided in residences

owned by DEAN. In regard to individuals who temporarily resided in CDH-related houses, halfway houses, or hotels, CDH staff regularly *forcefully demanded* Medicaid information from those residents and thereafter used that information to submit claims to Medicaid.

d. DEAN used a doctor to misdiagnose people to submit Medicaid claims, such as codes for workforce development and supportive living. DEAN paid the doctor to diagnose the homeless people with anything, so that DEAN and his associates could bill for the purported services. However, the diagnoses were falsified. There were no doctors or therapists that gave any services. Further, DEAN used his staff to fabricate medical notes for purposes of submitting Medicaid claims.

e. DEAN paid his staff via numerous means, including but not limited to Automatic Data Processing (ADP) and CashApp. DEAN paid recruiters a flat rate per person recruited to provide Medicaid information.

f. DEAN bought three recreational vehicles (RVs) in one week in December and used them to recruit individuals to provide Medicaid information. DEAN put the RVs in his company's name so that he could use them as a tax write-off.

g. Approximately 100 people were staying at DEAN's houses at the end of December 2024 and all of those in the houses were billed fraudulently.

h. DEAN and CDH-associated individuals managed multiple halfway houses and offered residents discounted rent in return for the residents' Medicaid information. CDH and DEAN submitted claims to Medicaid for those residents but did not render any services. Medicaid claims submission data confirmed that CDH did, in fact, submit Medicaid claims and receive Medicaid payments for those beneficiaries.

i. CDH and DEAN billed Medicaid for approximately $1 million of purportedly rendered services per month, but DEAN and CDH did not offer any actual services.

**OPEN-SOURCE INFORMATION ASSOCIATED WITH DEAN AND CDH**

53. During the investigation, agents reviewed open-source information from state and federal regulatory authorities, CDH websites, videos posted on social media, and news publications.

54. On or about April 25, 2025, an FBI agent reviewed a website for CDH, peersupportnc.com. While on the website, a popup stated "Cedric Dean Holdings, Inc; CRISIS ASSISTANCE; I have Medicaid and need emergency housing; I have Medicaid and need peer

support; I have Medicaid and need supported employment; No thanks." The website described the services of CDH as "Substance Abuse/ Mental Health/ Behavioral Health." In the "contact us" form, CDH listed the address of the SOUTH LAFAYETTE STREET PROPERTY.

55.     On the same day, an FBI agent searched public records for Cedric Dean Holdings, Inc. According to npiregistry.cms.hhs.gov, CDH's mailing address is the MCCHESNEY DRIVE PROPERTY, primary practice address is the Catherine Simmons Avenue Property, and secondary practice address is the LAFAYETTE STREET PROPERTY.

56.     On May 9, 2025, an FBI agent reviewed a Facebook Live video posted by an individual affiliated with CDH, with Facebook profile ID 100078723863468. The video was posted on May 8, 2025. During the video, a CDH employee told unidentified males that "[m]e and my brother, Cedric Dean, we've got a hotel down there and we got the houses." Later, the same CDH employee told a different unidentified male, "[w]e up here now doing mobile crisis for you know the people man … with Cedric Dean Holdings and Servant's Heart. We're trying to get in Raleigh so we can provide housing for you know the homeless in Raleigh." Later in the video, a female, speaking about an unidentified male, asked a CDH employee, "[d]id anyone run his information yet?" At the end of the video, a man told a CDH employee, "[h]e say he got Medicaid. He want to leave and come back to Charlotte tomorrow." The video depicts CDH employees recruiting homeless individuals whose information the conspirators could use to submit claims to Medicaid. A Medicaid beneficiary corroborated this video. The beneficiary advised that CDH held a mobile event in downtown Raleigh one day in April where they (CDH) were giving out plates of food. CDH employees asked the beneficiary if the beneficiary had Medicaid and asked for the beneficiary's email address. The beneficiary was given a plate of food and has not had any contact with CDH besides that one encounter. According to Medicaid claims submission data,

CDH billed Medicaid $3,200 for Mobile Crisis Management services purportedly rendered to the beneficiary on April 9, 2025. The member plan paid $3,168.00. The beneficiary informed the beneficiary's MCO that, with respect to the services billed by CDH, "no services were provided for me," and "they did nothing but gave me a plate of food."

57. On August 1, 2025, the Charlotte Observer published an article, "Charlotte housing activist ran program in Fayetteville but lacked proper permit." According to the article, "Dean said he's not received any government funding for his programs." Additionally, "[h]e [DEAN] said people weren't going to use Medicaid to pay for housing, since that's not allowed, but rather for treatment at the hotel."

## FINANCIAL ANALYSIS

58. According to claims data provided by MID as of July 7, 2025, during the time periods set forth herein, CDH submitted Medicaid claims totaling at least approximately $14,501,878.83 and received $8,947,424.24 in Medicaid payments on those claims. The bulk of the submitted and billed claims occurred in a six-month period.

59. Investigators reviewed information related to both ADP and to bank accounts in the name of DEAN and CDH. Some of that information and those accounts are discussed below.

### WELLS FARGO ACCOUNTS

*Target Wells Fargo Account 3167*

60. TARGET WELLS FARGO ACCOUNT 3167 is an Initiate Business Checking Account, held in the name of Cedric Dean Holdings, Inc., that was opened on July 25, 2024. Bank records show that DEAN and two CDH employees have access to this account.

61. In regard to deposits, Medicaid records show that CDH directed its claim reimbursements to TARGET WELLS FARGO ACCOUNT 3167. Further, NC Medicaid, through its MCOs, electronically deposited claim reimbursements to this account. To-date, law

enforcement has reviewed some of the records on this account and continues to collect more records. Specifically, records reviewed to-date show that, between November 4, 2024, and May 30, 2025, NC Medicaid MCOs deposited approximately $7,082,292 of claims reimbursement for services into TARGET WELLS FARGO ACCOUNT 3167. These $7,082,292 in Medicaid reimbursements accounted for approximately 94 percent of the deposits and other credits to TARGET WELLS FARGO 3167 during this November through May time-period.

62. In regard to outflows, records for TARGET WELLS FARGO ACCOUNT 3167 during this time period reveal, among other outflows, at least approximately $50,000 to State Employees Credit Union Account XXXX4005, a checking account held in the name Cedric Dean (hereafter, "SECU Account 4005"); branch and atm withdrawals of approximately $169,020; approximately $929,594.02 in ADP payments to numerous CDH employees; approximately $56,274.67 in Apple Cash payments and approximately $178,185.15 in Zelle payments; some payments to DEAN's family members; over $16,000 in purchases from a diamond and jewelry store; and approximately $1,593,970.60 in real estate purchases. Further, as identified in more detail below, this account funded approximately $255,992.35 in vehicle purchases, including but not limited to purchases of the vehicles identified for seizure herein, including the RVs used in the scheme.

### *Target Wells Fargo Account 3183*

63. TARGET WELLS FARGO ACCOUNT 3183 is an Initiate Business Checking Account, held in the name of Cedric Dean Holdings, Inc., that was opened on or about July 25, 2024. Bank records show that DEAN has access to this account.

64. In regard to deposits, records show that, between December 11, 2024, and May 28, 2025, NC Medicaid MCOs deposited approximately $491,986 of claims reimbursement for

services into TARGET WELLS FARGO ACCOUNT 3183. Medicaid reimbursements accounted for approximately 58 percent of the deposits and other credits to this account during the December 2024 through May 2025 time-period, with the Medicaid share of deposits substantially increasing by March and May 2025. In addition, records for TARGET WELLS FARGO ACCOUNT 3183 during the time-period discussed herein show that at least approximately $112,351 was transferred from TARGET WELLS FARGO ACCOUNT 3167 (an account also funded by MCOs) into TARGET WELLS FARGO ACCOUNT 3183.

65. In regard to outflows, records of WELLS FARGO ACCOUNT 3183 reveal, among other outflows during this time period: at least approximately $76,400 in transfers to SECU Account 4005; approximately $91,340 in ATM and Branch withdrawals; approximately $114,714.93 in Cash App payments; approximately $29,278.29 in Apple Cash and $11,599.42 in Zelle payments; the funding of $1,513.93 in real estate purchase expenses; and the purchase of approximately $24,455.35 in jewelry.

### *Graphic Summary of the Wells Fargo Accounts that Received Money from MCOs*

66. The above analysis and summary of significant transactions involving TARGET WELLS FARGO ACCOUNT 3167 and TARGET WELLS FARGO ACCOUNT 3183 is graphically depicted as follows. The financial analysis by law enforcement is ongoing and updated daily. Further, all figures are approximate, and the chart does not attempt to include all inflows or outflows involving the accounts noted therein:



### *Wells Fargo Account 3159*

67.      Wells Fargo Account 3159 is a Way2Savings Account, held in the name of Cedric Dean, that was opened on July 24, 2024.  Bank records show that DEAN has access to this account.

68.      Wells Fargo Account 3159 records reflect that, for the period July 25, 2024, to May 30, 2025, Wells Fargo Account 3159 received $125,280—which accounted for approximately 99 percent of the deposits and other credits into Wells Fargo 3159—from ADP payroll direct deposits from CDH.  As noted above, these ADP direct deposits were sourced from TARGET WELLS FARGO ACCOUNT 3167, an account identified for seizure herein and one of the two accounts that originally received funds from Medicaid.

### SECU ACCOUNT

### *SECU Account 4005*

69.      State Employees Credit Union Account XXXX4005, is an account held in the name Cedric Dean.  Bank records show that DEAN has access to this account.

70.     In regard to deposits, SECU Account 4005 records reflect as follows:

a.  Between August 7, 2024, and May 7, 2025, DEAN transferred approximately $76,400 from TARGET WELLS FARGO ACCOUNT 3183 to SECU Account 4005. This $76,400 in transfers represented approximately 41 percent of the deposits and other credits into SECU Account 4005 during the same time period. Included in these transfers were a $25,000 transfer on April 3, 2025 and a $25,000 transfer on May 6, 2025.

b.  Between February 24, 2025, and February 26, 2025, DEAN wired $25,000 and transferred an additional $25,000 from TARGET WELLS FARGO ACCOUNT 3167 into TARGET SECU ACCOUNT 4005. This wire and transfer represented approximately 26 percent of the deposits and other credits into SECU Account 4005 during the same time-period.

c.  Between March 6, 2025, and April 9, 2025, DEAN transferred $51,360 from Wells Fargo Account 3159 (an account funded almost entirely by ADP payroll deposits from Cedric Dean Homes) to SECU Account 4005. These $51,360 in transfers represented approximately 27 percent of the deposits and other credits into SECU Account 4005 during the same time-period.

71.     In regard to outflows, between August 27, 2024, and July 14, 2025, funds were depleted from SECU Account 4005 via $32,418 in branch withdrawals and $150,400 in payments/transfers to SECU mortgage no. XXXXX00-91, a mortgage associated with DEAN and the MCCHESNEY DRIVE PROPERTY.

*Graphic Summary of SECU Account 4005*

72.     The inflows and outflows identified herein during this time-period are graphically depicted as follows. The law enforcement analysis of this account and other accounts continues, and this graphic does not attempt to depict all transactions involving the accounts. Further, all figures herein are approximate:



*Seizures*

73.     On or about October 16, 2025, law enforcement executed seizure warrants in Charlotte, North Carolina on the two TARGET WELLS FARGO ACCOUNTS, and seized approximately $108,078.53 from WELLS FARGO ACCOUNT 3167 and approximately $6,075.89 from TARGET WELLS FARGO ACCOUNT 3183.

74.     On the same date, law enforcement executed a Seizure Warrant on SECU Account 4005.   Specifically law enforcement served a Seizure Warrant on SECU at 10:14 AM.   At approximately 1:35 PM, law enforcement also personally served DEAN with a copy of the prior version of this Amended Complaint.   That prior version of this Amended Complaint explicitly described the use of fraud proceeds to fund SECU Account 4005.   Nonetheless, law enforcement was not able to seize funds from SECU because (1) SECU did not freeze the funds as of 10:14AM, and (2) despite being served with the Complaint at 1:35PM, at 5:30 PM on the same day, DEAN visited a SECU branch in Steele Creek and liquidated almost fifty thousand dollars, via a $30,000 cashier's check and an $18,500 cash withdrawal, from that account.   Law enforcement has not yet identified the disposition of the $18,500 in cash and whether DEAN used that cash to further fund

purchases of assets, pay conspirators, or for other purposes, although public reporting suggests that the cash was not used to fund rental payments for halfway houses purportedly operated by CDH .

## VEHICLES

75.     Bank records and vehicle purchase records reflect the following purchases of the vehicles that constitute some of the **DEFENDANT PROPERTIES**:

*Silverado*

76.     TARGET WELLS FARGO ACCOUNT 3167 records reflect a branch withdrawal, on or about December 18, 2024, in the form of a $14,000 cashier's check to Aspen Auto Group.

77.     Further, according to a Bill of Sale, on or about December 18, 2024, DEAN purchased the SILVERADO for $14,000 from Aspen Auto Group.

78.     The SILVERADO, which law enforcement seized pursuant to a Seizure Warrant from a Charlotte-area car dealership/repair shop on or about October 20, 2025, is pictured as follows:



***Thor Ace Motorhome***

79.     TARGET WELLS FARGO ACCOUNT 3167 records reflect the purchase, on or about December 26, 2024, of a $52,000 cashier's check to an individual identified herein as Seller PZ.

80.     Further, according to a Bill of Sale, on or about December 26, 2024, DEAN purchased the THOR ACE MOTORHOME for $52,000 from Seller PZ.

81.     In and around October 28, 2020, law enforcement located the THOR ACE MOTORHOME in Louisiana, where DEAN likely intended to expand the operations of CDH. The THOR ACE MOTORHOME is depicted, around the time of seizure pursuant to a Seizure Warrant, as follows, with a prominent CDH logo on the back of the vehicle:



***Georgetown Motorhome***

82.     TARGET WELLS FARGO ACCOUNT 3167 records reflect the purchase, on or about December 30, 2024, of a $40,000 cashier's check to an individual identified herein as Seller CC.

83. Further, according to a Bill of Sale, on or about December 30, 2024, Cedric Dean Holdings, Inc. purchased a 2013 GEOT, VIN1F66F5DYXC0A06353—the GEORGETOWN MOTORHOME—from Seller CC and another individual identified herein as Seller MC.

84. The GEORGETOWN MOTORHOME, which law enforcement seized from a property in Shelby, North Carolina on or about October 21, 2025, is pictured as follows and, at the time of seizure pursuant to a Seizure Warrant, was adorned with a prominent CDH logo:



***Yukon Denali***

85. TARGET WELLS FARGO ACCOUNT 3167 records reflect the funding, on or about February 18, 2025, of a $67,998.00 check to Gastonia Chevrolet.

86. Further, according to a Bill of Sale, on or about February 17, 2025, Cedric Dean Holdings purchased the Yukon Denali from Gastonia Chevrolet.

87. According to information obtained during interviews conducted and search warrants executed on or about October 16, 2025, DEAN and/or CDH traded this vehicle to a hotel

owner or manager in payment for lodging services previously provided to CDH. Law enforcement has not seized this vehicle, but provides information on the vehicle herein for background.

### *Ram Big Horn*

88.     TARGET WELLS FARGO ACCOUNT 3167 records reflect the funding, on or about April 11, 2025, of a $56,424.35 cashier's check to Classic CDJR Lancaster, known to your Affiant as Classic Chrysler, Dodge, Jeep, and RAM. Further, according to a Bill of Sale, on or about April 11, 2024, DEAN purchased a GMC Yukon for $56,424.35 from Classic CDJR Lancaster.

89.     On or around August 9, 2025, DEAN and/or CDH traded the Yukon for a 2021 Dodge Ram 1500 Big Horn Crew Cab, VIN 1C6SRFFT9MN792975, ultimately registered to DEAN.

90.     The RAM BIG HORN, which law enforcement seized from THE YOUNGBLOOD ROAD PROPERTY on or about October 16, 2025, is pictured as follows:



**REAL PROPERTIES**

91.     In addition to funding accounts and vehicles, the scheme and conspiracy also funded the purchase of multiple real properties.  The following chart depicts the funding of various real properties, each of which is discussed in more detail below.



*The South Lafayette Street Property*

92.     According to a North Carolina General Warranty Deed, dated January 2022 and filed in the Cleveland County Register of Deeds, in or about January 2022, the Grantors, identified herein as KC and spouse, DC, et al. granted the SOUTH LAFAYETTE STREET PROPERTY to Cedric Dean Homes, LLC for consideration of $480,000.  WELLS FARGO

ACCOUNT 3167 bank records show a payoff from WELLS FARGO ACCOUNT 3167 to Sprout Mortgage/Planet Home Lending in the amount of $190,0000 on March 10, 2025.

93.     The transaction to purchase the SOUTH LAFAYETTE STREET PROPERTY is graphically depicted as follows:



94.     The SOUTH LAFAYETTE STREET PROPERTY is depicted as follows:



*The McChesney Drive Property*

95.     According to a North Carolina General Warranty Deed, dated October 30, 2022, and filed in the Mecklenburg County Register of Deeds, in or about October 30, 2022, Grantor

AM and spouse DM granted the MCCHESNEY DRIVE PROPERTY to Grantee Cedric Lamonte Dean, unmarried, and Betty D. Baker,[8] unmarried, for consideration of $390,000.

96.     Following multiple past-due mortgage notices as to the mortgage on this property, at least a portion of the purchase was funded by SECU Account 4005, which, in-turn, was funded by deposits and transfers from the Wells Fargo accounts funded by fraud proceeds as set forth herein.   For example, some of the larger payments to the mortgage account from SECU ACCOUNT 4005 were as follows:

- $49,000 on March 6, 2025 (source: transfer from SECU Account 4005);

- $47,108.57 on March 10, 2025 (the payment consisted of $47,108.57 total, at least $20,000 of which was directly traced from fraud proceeds deposited into SECU Account 4005 and the remainder of which remains under investigation);

- $20,000 on March 10, 2025 (source: transfer from SECU Account 4005);

- $30,000 on April 8, 2025 (source: transfer from SECU Account 4005); and

- $25,000 on April 11, 2025 (source: transfer from SECU Account 4005).

97.     During roughly the same time-period as the March through April payments on the mortgage, SECU Account 4005 was funded by the following deposits:

- A February 24, 2025 deposit of $25,000, funded by a wire transfer from WELLS FARGO ACCOUNT 3167;

- A February 26, 2025 deposit of $25,000, funded by an ACH deposit from WELLS FARGO ACCOUNT 3167;

- A March 6, 2025 deposit of $19,000, funded by an ACH deposit from WELLS FARGO ACCOUNT 3159.  As noted above, WELLS FARGO ACCOUNT 3159 is Cedric Dean's personal checking account, which in-turn was funded by ADP deposits;

- A March 25, 2025 deposit of $10,000, funded by an ACH Deposit from WELLS FARGO ACCOUNT 3159;

- An April 3, 2025 deposit of $25,000, funded by an ACH Deposit from WELLS FARGO ACCOUNT 3183; and

---

[8] Ms. Baker is a family member of DEAN.

- An April 9, 2025 deposit of $19,000, funded by an ACH Deposit from WELLS FARGO ACCOUNT 3159.

98. The MCCHESNEY DRIVE PROPERTY mortgage was paid in full on or about May 8, 2025 via a cashier's check in the amount of $233,335.02 drawn on WELLS FARGO ACCOUNT 3167, another account funded by fraud proceeds as identified herein.

99. The transactions to purchase THE MCCHESNEY DRIVE PROPERTY are graphically depicted as follows:



100. Beyond being intimately connected to the flow of fraud proceeds in the scheme, the MCCHESNEY DRIVE PROPERTY was also otherwise connected to the scheme in a variety of ways, including but not limited to the following:

a. The MCCHESNEY DRIVE PROPERTY was Cedric DEAN's prior residence from October 2020 until June 2025.

b. CDH employees entered Medicaid service notes for DEAN and CDH under DEAN's direction while living with DEAN at this location. DEAN provided CDH employees with a list of names and a format for entering service notes online.

c. DEAN paid an individual $1,000 at this location for moving out of a hotel operated by DEAN in Charlotte, North Carolina.

    d.   According to Medicaid records and CDH corporate filings, this location is the mailing address for CDH.

101. The MCCHESNEY DRIVE PROPERTY is depicted as follows:



***The Gold Street Property***

102. According to a North Carolina Quitclaim Deed, dated in January 2025 and filed in the Cleveland County Register of Deeds, in or about January 2025, Grantor SM granted the GOLD STREET PROPERTY to Grantee Cedric Dean for $160,809.04 in consideration. No evidence of a mortgage on the GOLD STREET PROPERTY was discovered.

103. Further, a North Carolina General Warranty Deed for the GOLD STREET PROPERTY was previously filed on April 21, 2023. That old General Warranty Deed identifies the Grantors of the GOLD STREET PROPERTY as James E. Baker and wife, Deborah Jane Baker

and the Grantee as SM, with an address of 5502 McChesney Drive, Charlotte, NC 28269 (the MCCHESNEY DRIVE PROPERTY otherwise identified herein).

104. WELLS FARGO ACCOUNT 3167 records indicate that, on January 27, 2025, there was a branch counter withdrawal from WELLS FARGO ACCOUNT 3167 for cashier's check number 6730801055, payable to State Employees Credit Union, in the amount of $163,635.58 (SECU 4861509750). This branch withdrawal and check to SECU corresponds with a payment to a SECU mortgage on the MCCHESNEY DRIVE PROPERTY, on which SM owed an outstanding balance. Further, the timing of this payment on SM's mortgage corresponds with the transfer of the deed for the GOLD STREET PROPERTY from SM to Dean, presumably in exchange for the payoff by DEAN, via fraud proceeds, of the mortgage that SM owed on the MCCHESNEY DRIVE PROPERTY.

105. The conspirators used the GOLD STREET PROPERTY to house individuals from whom the conspirators obtained Medicaid information for purposes of billing.

106. The GOLD STREET PROPERTY is graphically depicted as follows:



*The Youngblood Road Property*

107. According to a North Carolina General Warranty Deed, dated May 16, 2025 and filed in the Mecklenburg County Register of Deeds, in or about May 2025, Grantor Home Buying, LLC (associated with individual KN) granted the Youngblood Road Property to Grantee Cedric Dean, a single man, for consideration of $1,000,000.

108. The purchase was funded by May 2025 transactions, totaling $1,008,513.90, as follows. All of the May transactions were funded by Wells Fargo accounts, controlled by Dean, that previously received fraud proceeds:

- On May 13, 2025, an MCO deposited $525,767.20 into WELLS FARGO ACCOUNT 3167.

- Then, on May 13, 2025, a $200,000 ACH transfer was conducted from WELLS FARGO ACCOUNT 3167 to a bank account controlled by KN, the individual associated with the seller of the Youngblood Road Property.

- Also on May 13, 2025, a $300,000 ACH transfer was conducted from WELLS FARGO ACCOUNT 3167 to a bank account of the Hutchens Law Firm, a closing attorney firm.

- Later, on May 15, 2025, a $1,513.93 ACH transfer was conducted from WELLS FARGO ACCOUNT 3183 to a bank account of the Hutchens Law Firm.

- Finally, on May 16, 2025, a $507,000 ACH transfer was conducted from WELLS FARGO ACCOUNT 3167 to a bank account of the Hutchens Law Firm.

109. The transactions that funded THE YOUNGBLOOD ROAD PROPERTY are graphically depicted as follows:



110. The YOUNGBLOOD ROAD PROPERTY is depicted (prior to the installation of a

security gate and then after installation of the gate) as follows:





111.    On October 16, 2025, a search of the YOUNGBLOOD ROAD PROPERTY yielded

the following evidentiary items, which law enforcement continues to review:

    a.   Ledgers with names, dates of birth, and other identifying information;

    b.   Patient assessments;

    c.   No Bounds inc. Meeting Agenda;

    d.   Handwritten notes;

    e.   Transcripts for Cedric Dean;

    f.   Notification of Prepayment review for Cedric Dean Holdings, Inc from WellCare;

    g.   Sign Up Sheet for Peer Support Center Day Program;

    h.   Cedric Dean Holdings Referral Forms;

    i.   North Carolina Vehicle Titles; and

j.   Medicaid documents.

## DEAN INCOME

112.   Affiant has not identified substantial income sources, other than the fraud scheme identified herein, wherein DEAN could have funded the transactions herein and the DEFENDANT PROPERTIES.

113.   For example, according to public records, DEAN was released from federal prison on November 28, 2017 and remained on probation until December 28, 2018.   In addition, according to public records from North Carolina Division of Employment Security Commission from 2018 through 2024, DEAN's reported wage/earnings history during the entirety of this approximately six year period totaled only $167,743.[9]

114.   However, beginning in the Fall/Winter of 2024 through 2025, DEAN's income substantially increased.   Specifically, according to an ADP earnings report for CDH, for the time-period, January 3, 2025 through September 5, 2025, CDH paid Dean $10,000 in gross pay per week per 40 hours worked, for total gross pay of $360,000 during the relevant time period.   During this time-period, the net pay to DEAN ranged between $5,577.63 and $6,197.63 per week.   During this time-period, $210,787.48 in pay originated from TARGET WELLS FARGO ACCOUNT 3167 and was deposited into Wells Fargo Account 3159.

## CONCLUSION

115.   In summary, DEAN, CDH, and others engaged in a massive and far-reaching fraud and then transacted in the illegal proceeds of that fraud, both to promote the fraud and to enrich themselves.

---

[9] In at least three instances, reported income noted in certain records held at banks identified herein do not match the North Carolina Division of Employment Security Commission figures.   Law enforcement continues to investigate these discrepancies.

116. The DEFENDANT PROPERTIES constitute or are derived from proceeds of this health care fraud and conspiracy to commit health care fraud; and/or are property involved in money laundering conspiracy, substantive money laundering, and illegal monetary transactions, and are therefore subject to forfeiture.

117. By virtue of the foregoing and pursuant to 18 U.S.C. § 981(f), all right, title, and interest in the DEFENDANT PROPERTIES vested in the United States at the time of the commission of the unlawful act giving rise to forfeiture and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the court that:

1. Due notice be given to all parties to appear and show cause why forfeiture should not be decreed;

2. Judgment be entered declaring the DEFENDANT PROPERTIES condemned and forfeited to the United States of America for disposition according to law; and

3. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the DEFENDANT PROPERTIES as required by 18 U.S.C. § 1921.

Respectfully submitted this the 6th day of November, 2025.

DALLAS A. KAPLAN
ATTORNEY FOR THE UNITED STATES[10]

**s/ Benjamin Bain-Creed**
FL Bar Number 0021436
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Facsimile: (704) 344-6629
Email: benjamin.bain-creed@usdoj.gov

---

[10] Acting under the authority conferred by 28 U.S.C. § 515.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

<u>V E R I F I C A T I O N</u>

I declare under penalty of perjury that the factual information contained in the foregoing Amended Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 6th day of November, 2025

_Marisa Brown_
_____
Special Agent Marisa Brown
Federal Bureau of Investigation